**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

CASE NO. _____

**CYBERCODERS, INC.**, a California
corporation,

    **Plaintiff,**

  v.

**LEVELOCITI, LLC**, a Delaware limited
liability company, **ALEXANDRIA**
**ACEVEDO**, an individual, **IVELISSE**
**ARRIAGA**, an individual, **JOHN O'GRADY**,
an individual, **KEITH SHULER**, an individual,
**KYLE WESTHORPE**, an individual, and
**DELANO WILLIAMS**, an individual,

    **Defendants.**
_____/

## <u>VERIFIED COMPLAINT</u>

  CyberCoders, Inc. (d/b/a CyberCoders) ("CyberCoders", "Company", or "Plaintiff"), by and through its undersigned counsel, files this Verified Complaint against Defendants Levelociti, LLC ("Levelociti"), Alexandria Acevedo ("Acevedo"), Ivelisse Arriaga ("Arriaga"), John O'Grady ("O'Grady"), Keith Shuler ("Shuler"), Kyle Westhorpe ("Westhorpe"), and Delano Williams ("Williams") (collectively "Defendants"). In support thereof, CyberCoders states as follows:

## <u>INTRODUCTION</u>

  1. This action is brought by CyberCoders to prevent six former employees, Acevedo, Arriaga, O'Grady, Shuler, Westhorpe, and Williams (collectively, the "Individual Defendants") from unlawfully competing with CyberCoders and soliciting customers and candidates in breach

1

of their contractual duties to CyberCoders, and a new competitor, Levelociti, from tortiously and knowingly interfering with the Individual Defendants' contracts with CyberCoders.

2.      CyberCoders is a leading recruiting firm that has spent more than 23 years and millions of dollars developing a recruiting network to match qualified candidates with job opportunities across the United States.

3.      During their employment, the Individual Defendants were hired by and all worked under the supervision of Charles Cooke ("Cooke"), then a VP of Recruiting and responsible for running one of the six (6) Recruiting Divisions at CyberCoders. Cooke knew that the Individual Defendants executed restrictive covenant agreements with CyberCoders.

4.      Westhorpe also previously worked under the supervision of Nicolas Benedetto ("Benedetto"), then a Director of Recruiting and a member of Cooke's Division.

5.      On February 17, 2025, Cooke and Benedetto abruptly resigned from CyberCoders to start a competing recruiting firm – Levelociti.

6.      Shockingly, the Individual Defendants all resigned within 36 hours of Cooke and Benedetto. However, CyberCoders did not know the Individual Defendants were breaching their non-competes by working for Levelociti until a March 24 preliminary injunction hearing in *CyberCoders v. Cooke, et al.*, Case No. 25-cv-80320-AMC (hereinafter the "Cooke/Benedetto Lawsuit") when Cooke and/or Benedetto testified that the Individual Defendants were employed by Levelociti.

7.      On April 15, 2025, this Court, in the Cooke/Benedetto Lawsuit, entered a preliminary injunction against Cooke and Benedetto enjoining them from violating their non-competition and non-solicitation obligations to CyberCoders.

8.     Indeed, Cooke and/or Benedetto testified in the Cooke/Benedetto Lawsuit that, while they were still employed by CyberCoders, Cooke and/or Benedetto extended offers of employment to the Individual Defendants (except Acevedo and O'Grady) to join Levelociti.

9.     Cooke and/or Benedetto testified in the Cooke/Benedetto Lawsuit that they hired Acevedo and O'Grady to work at Levelociti within a day or two of their resignations.

10.     Cooke and/or Benedetto further testified in the Cooke/Benedetto Lawsuit that the Individual Defendants each accepted offers of employment from Levelociti working remotely out of their homes.

11.     By the following day, each of the Individual Defendants abruptly resigned from CyberCoders to work for Levelociti, in violation of their non-compete obligations to CyberCoders.

12.     Upon information and belief, the Individual Defendants are actively soliciting CyberCoders' customers, potential customers, and candidates though their employment at Levelociti.

13.     CyberCoders seeks the preliminary injunctive relief described herein to enforce its contractual rights and prevent the Individual Defendants from unlawfully competing with CyberCoders and continuing to solicit, seek to do business with, and recruit CyberCoders' customers, potential customers, candidates, and employees, to prevent Levelociti from tortiously interfering with the Individual Defendants' contracts with CyberCoders, to prevent Defendants from causing further irreparable harm to CyberCoders, and to recover damages inflicted by Defendants on CyberCoders' business and operations.

**THE PARTIES**

14.     CyberCoders is a leading nationwide recruiting firm that specializes in contract, contract-to-hire, and full-time direct-hire roles.

15.     CyberCoders is a California corporation with its principal place of business in Irvine, California.

16.     Levelociti is a new recruiting firm owned by Cooke and Benedetto that competes with CyberCoders.

17.     Levelociti is a Delaware limited liability company and has a principal place of business in Fort Pierce, Florida.

18.     Upon information and belief, Cooke and Benedetto are the sole members of Levelociti and are both citizens and residents of Florida.

**A.     Defendant Acevedo**

19.     Upon information and belief, Acevedo is an adult individual who resides in Jacksonville, Florida.

20.     On or about September 11, 2023, CyberCoders hired Acevedo as a Recruiter to work remotely from her home in Jacksonville, Florida.

21.     During her employment, CyberCoders promoted Acevedo to Executive Recruiter.

22.     At the time of her resignation from CyberCoders, Acevedo was employed as Executive Recruiter.

23.     On February 18, 2025 at 10:20 a.m., Acevedo resigned from her employment with CyberCoders via email "effective immediately."

24.     At the time of her resignation from CyberCoders, Acevedo worked for CyberCoders remotely, primarily from her home in Jacksonville, Florida.

**B.     Defendant Arriaga**

25.     Upon information and belief, Arriaga is an adult individual whose resides in Denver, Colorado.

26.     On or about February 24, 2020, CyberCoders hired Arriaga to work as a Recruiter out of the Company's Palm Beach Gardens, Florida office.

27.     At the time of her hire by CyberCoders, Arriaga was a resident of Florida, and worked for CyberCoders out of its Florida office, which was her primary office location in CyberCoders' records.

28.     Effective January 1, 2021, CyberCoders closed the Florida office, and Arriaga became fully remote working out of her home.

29.     Throughout her employment, CyberCoders promoted Arriaga multiple times. Ultimately, she was promoted to Recruiting Manager I and led a team of recruiters in Cooke's Division.

30.     On Monday, February 17, 2025 at 11:50 a.m., Arriaga resigned from her employment with CyberCoders via email "effective today."

31.     At the time of her resignation from CyberCoders, Arriaga was employed as a Recruiting Manager I and led a team of four recruiters, including Shuler.  She was also responsible for about $1.5 million in annual business.

## C.     **Defendant O'Grady**

32.     Upon information and belief, O'Grady is an adult individual whose resides in Ocean Ridge, Florida.

33.     On or about May 16, 2022, CyberCoders hired O'Grady as an Executive Recruiter working remotely from his Florida home.

34.     CyberCoders promoted O'Grady twice during the course of his employment.

35.     On the afternoon of February 18, 2025 and without advanced notice, O'Grady abruptly resigned from CyberCoders.

36.     At the time of his resignation from CyberCoders, O'Grady was employed as a Lead Recruiter and was responsible for over $400,000 in annual business.

37.     Throughout his employment with CyberCoders, O'Grady worked for CyberCoders remotely, primarily from his home in Ocean Ridge, Florida.

**D.      Defendant Shuler**

38.     Upon information and belief, Shuler is an adult individual whose resides in Tampa, Florida.

39.     On or about October 18, 2022, CyberCoders hired Shuler as a Recruiter working remotely from his Florida home.

40.     During his employment, CyberCoders promoted Shuler twice.

41.     On February 18, 2025 at 8:23 a.m., Shuler announced his resignation via email "effective immediately."

42.     At the time of his resignation from CyberCoders, Shuler was employed as an Associate Manager and was responsible for over $480,000 in annual business.

43.     At the time of his resignation from CyberCoders, Shuler worked for CyberCoders remotely, primarily from his home in Tampa, Florida.

**E.      Defendant Westhorpe**

44.     Upon information and belief, Westhorpe is an adult individual who resides in Palm Beach Gardens, Florida.

45.     On or about January 6, 2020, CyberCoders hired Westhorpe to work as a Recruiter out of the Company's Palm Beach Gardens, Florida office.

46.     At the time of his hire by CyberCoders, Westhorpe was a resident of Florida, and worked for CyberCoders out of its Florida office, which was his primary office location in CyberCoders' records.

47.     During his employment, CyberCoders promoted Westhorpe four times, eventually to Recruiting Manager II leading a team of recruiters in Cooke's Division.

48.     On February 18, 2025 at 8:56 a.m., Westhorpe submitted his resignation via email "effective Tuesday, February 18th."

49.     At the time of his resignation from CyberCoders, Westhorpe was employed as Recruiting Manager II and led a team of six recruiters. He was also responsible for over $2 million in annual business.

50.     Throughout his employment with CyberCoders, Westhorpe worked for CyberCoders remotely, primarily from his home in Palm Beach Gardens, Florida.

**F.     Defendant Williams**

51.     Upon information and belief, Williams is an adult individual whose resides in Delray Beach, Florida.

52.     On or about July 20, 2020, CyberCoders hired Williams as a Recruiter out of the Company's Palm Beach Gardens, Florida office.

53.     At the time of his hire by CyberCoders, Williams was a resident of Florida, and worked for CyberCoders out of its Florida office, which was his primary office location in CyberCoders' records.

54.     During his employment, CyberCoders promoted Williams three times, eventually to Recruiting Manager I leading a team of recruiters in Cooke's Division.

55.     On February 18, 2025 at 10:09 a.m., Williams resigned from his employment with CyberCoders via letter "effective February 18th, 2025[.]"

56.     At the time of his resignation from CyberCoders, Williams was employed as Recruiting Manager II and led a team of four recruiters, including O'Grady. He was also responsible for almost $1.5 million in annual business.

57.     At the time of his resignation from CyberCoders, Williams worked for CyberCoders remotely, primarily from his home in Delray Beach, Florida.

## JURISDICTION AND VENUE

58.     This Court has original jurisdiction over this action because complete diversity exists between CyberCoders and Defendants and the amount in controversy exceeds $75,000. *See* 28 U.S.C. § 1332.

59.     Venue is proper in this District because the wrongful acts described in this Complaint occurred primarily in Florida, specifically the actions taken by Defendants alleged herein occurred in this District.

60.     The Individual Defendants are all employed by Levelociti, a company with a principal place of business in Fort Pierce, Florida, and are therefore violating their restrictive covenants in this District.

61.     With the exception of Arriaga, each of the Individual Defendants is a citizen and resident of Florida, and, for their entire employment with CyberCoders, they were employed by CyberCoders in Florida. Therefore, the Court has personal jurisdiction over them.

62.     Arriaga was hired by CyberCoders and assigned to the Palm Beach Gardens office. Arriaga entered into the Arriaga Agreement with CyberCoders while in Florida, and consented to Florida venue in that agreement. Therefore, the Court has personal jurisdiction over Arriaga.

63.     Additionally, this Court has personal jurisdiction over the Individual Defendants because they contractually consented to personal jurisdiction in Florida.

### FACTUAL ALLEGATIONS

**A.      CyberCoders' Business**

64.     For over 23 years, CyberCoders has been a leading, award-winning nationwide recruiting firm that helps businesses find top talent for recruiting, staffing, assignment or placement of temporary, temporary-to-hire, and permanent/direct hire employees.

65.     Put simply, CyberCoders works to find the best candidates to fill open positions for its customers.

66.     Over two decades, CyberCoders has built a nationwide recruiting structure that specialized in the following industries: Accounting & Finance; Biotech & Pharma; Construction; Engineering & Manufacturing; Legal; and Tech & IT.

67.     Additionally, CyberCoders has developed proprietary recruiting technology, Cyrus, to assist in matching applicants to the best job opportunities more efficiently.

68.     CyberCoders has helped over 73,000 job seekers find permanent, full-time positions.

**B.      CyberCoders Entrusted The Individual Defendants with its Proprietary, Confidential Information and Trade Secrets**

69.     More than anything else, the recruiting industry is a business about people.  The success of a recruiting firm is directly dependent upon the goodwill and relationships it builds with its customers and with the candidates it places with customers.  CyberCoders' employees are the key to building and maintaining these relationships and goodwill.

70.      Over the years and at significant expense, CyberCoders has cultivated enduring relationships with its customers and candidates.

71.     By virtue of their job duties, the Individual Defendants were provided access to confidential information about CyberCoders' customers and potential customers and their staffing needs, and to confidential information about candidates' skills, qualifications, work history, preferences, location, benefits and compensation requirements.

72.     CyberCoders has developed and maintains proprietary intellectual property – Cyrus – to marshal its institutional knowledge and trade secrets to enable CyberCoders' employees to effectively fulfill customer needs.

73.     Cyrus contains competitively sensitive information about CyberCoders' customers and potential customers nationwide, such as: the identity and contact information for their key decision-makers and actual buyers of CyberCoders' services; customer preferences; a history of the previous needs (job orders) fulfilled by CyberCoders; the identities, resumes, portfolios, desired salaries and contact information of the job-seekers that have been placed there; pricing information and information about current and projected staffing needs; a history of the sales calls and correspondence with those customers; and key performance data for CyberCoders' recruiters.

74.     The information contained within Cyrus represents the aggregation of years of data from numerous internal and external sources at substantial expense to CyberCoders essential to CyberCoders' national recruiting business.

75.     The information aggregated in Cyrus includes information that CyberCoders has purchased from multiple external sources and aggregated and cross referenced in a way that is not commercially available, as well as information that CyberCoders employees have input through their tenure working for CyberCoders.

76.     CyberCoders created Cyrus to function as the backbone of its nationwide business model, providing CyberCoders employees with all the information they need to succeed in the current recruiting landscape.

77.     The information contained in Cyrus is unique – it is not publicly available or easily ascertainable, and would be extremely valuable in the hands of a competitor.

78.     CyberCoders takes steps to protect the trade secrets contained in Cyrus, only allowing employees of CyberCoders and its affiliates to access the platform and requiring those employees to execute confidentiality agreements. Restricting access to internal personnel means that only individuals who have entered into confidentiality agreements (such as those entered into by the Individual Defendants) and who have agreed to preserve the confidentiality of CyberCoders' trade secrets, are able to view the information contained in Cyrus.

79.     Even within Cyrus, CyberCoders takes steps to restrict information regarding active customers, including information regarding the identity and contact information of key individuals at CyberCoders' active customers, to those employees with a business need to have access to that information. Generally, full access to information for active customers is only granted to those employees assigned to that account, and to employees in the management chain above the assigned employee.

80.     CyberCoders has developed and structured Cyrus to allow CyberCoders employees to develop significant relationships with the customer, learn specific confidential information about the customer and build customer goodwill with CyberCoders' customers and potential customers.

81.     CyberCoders assigns active and potential customers to specific employees, and generally prohibits other employees from working with those customers.

82.     When CyberCoders assigns an active or potential customer to an employee, CyberCoders' systems prevent other CyberCoders employees from communicating with that customer.

83.     Therefore, CyberCoders focuses all its confidential information and trade secrets onto select employees for the purpose of interacting with active and potential customers, specifically to develop significant relationships and customer goodwill.

84.     The Individual Defendants developed significant relationships and customer/candidate goodwill with CyberCoders' customers, potential customers, and candidates during their employment with CyberCoders while using CyberCoders confidential information and trade secrets.

85.     Even if the Individual Defendants no longer have access to CyberCoders' trade secrets, their significant relationships and customer goodwill – built while the Individual Defendants were employed by CyberCoders and using CyberCoders' confidential information and trade secrets – persist.

86.     At the time of her resignation, Arriaga was a Recruiting Manager I, and a leader of a 5-person team that included Shuler.

87.     At the time of his resignation Westhorpe was a Recruiting Manager II and leader of a 7-person team.

88.     At the time of his resignation Williams was a Recruiting Manager I and leader of a 5-person team that included O'Grady.

89.     As Recruiting Managers for CyberCoders and leaders of their own recruiting teams, Arriaga, Westhorpe and Williams developed and built goodwill with their respective team members.

90.     Arriaga, Westhorpe and Williams also had detailed access to their team members' production metrics.

91.     Given their management-level positions with CyberCoders, Arriaga, Westhorpe and Williams had access to large amounts of critical data housed in Cyrus.

92.     Specifically, Arriaga, Westhorpe and Williams had access to CyberCoders' business strategies for customers and potential customers who worked with anyone within the employees they supervised/managed, including pricing strategies, negotiation practices and thresholds, and prior concessions to customers.

93.     Acevedo, Shuler, and O'Grady similarly had large amounts of access to critical data housed in Cyrus about the customers and potential customers to who they were assigned.

94.     In connection with their employment with CyberCoders, the Individual Defendants spent a large amount of their time and effort developing relationships and building goodwill with CyberCoders' customers, potential customers, and candidates. These customer and candidate relationships are two of the most critical aspects of CyberCoders' business, and are essential to successfully making placements.

**C.      The Individual Defendants Executed Confidentiality, Non-Solicitation, and Non-Competition Agreements with CyberCoders.**

95.     Upon their hiring by CyberCoders, and for valuable consideration including their employment with CyberCoders, valuable training, and access to the Company's confidential, proprietary information and trade secrets, each of the Individual Defendants entered into a Confidentiality, Non-Solicitation and Non-Competition Agreement with CyberCoders ("Agreements").

a.  Acevedo entered into a Confidentiality, Non-Solicitation and Non-Competition Agreement with CyberCoders on August 18, 2023 ("Acevedo Agreement"). A copy of Acevedo Agreement is attached as **Exhibit A.**

b.  Arriaga entered into the Confidentiality, Non-Solicitation and Non-Competition Agreement with CyberCoders on February 11, 2020 ("Arriaga Agreement"). A copy of the Arriaga Agreement is attached as **Exhibit B**.

c.  O'Grady entered into the Confidentiality, Non-Solicitation and Non-Competition Agreement with CyberCoders on May 10, 2022 ("O'Grady Agreement").  A copy of the O'Grady Agreement is attached as **Exhibit C**.

d.  Shuler entered into the Confidentiality, Non-Solicitation and Non-Competition Agreement with CyberCoders on October 18, 2022 ("Shuler Agreement"). A copy of the Shuler Agreement is attached as **Exhibit D**.

e.  Westhorpe entered into the Confidentiality, Non-Solicitation and Non-Competition Agreement with CyberCoders on January 3, 2020 ("Westhorpe Agreement"). A copy of the Westhorpe Agreement is attached as **Exhibit E**.

f.  Williams entered into the Confidentiality, Non-Solicitation and Non-Competition Agreement with CyberCoders on June 19, 2020 ("Williams Agreement"). A copy of the Williams Agreement is attached as **Exhibit F**.

96.  Arriaga, Westhorpe, and Williams were each hired by CyberCoders in 2020, and the Arriaga Agreement, the Westhorpe Agreement, and the Williams Agreement are identical in substance (the "2020 Agreements").

97.     O'Grady and Schuler were each hired by CyberCoders in 2022, and the O'Grady Agreement and the Schuler Agreement are functionally identical in substance (the "2022 Agreements").

**1.     The 2020 Agreements' Non-Compete**

98.     In the 2020 Agreements, Section 2.2(a) of the Agreements prohibits Arriaga, Westhorpe and Williams from competing with CyberCoders within the applicable territory during their employment with the Company and for a period of twelve (12) months following the termination of their employment:

> During the term of Employee's employment with the Company, and for a period of twelve months after the termination of Employee's employment for any reason, Employee will not, directly or indirectly, do any of the following:
>
> **(i) work in a Competing Position for a Competing Business within the Restricted Territory**; or (ii) own, maintain, operate or have any ownership interest in a Competing Business within the Restricted Territory;

Ex. B, E, and F, § 2.2(a) (emphasis added).

99.     The 2020 Agreements define Competing Business to mean "any person, business, or subdivision of a business which provides products or services that are the same as or substantially similar to, and competitive with, the Company Business or which is actively planning to engage in the Company Business." Ex. B, E, and F, § 1.1(b).

100.     The 2020 Agreements define Restricted Territory as:

> [A] fifty (50) mile radius around any office of the Company, including Employee's office in their personal residence, if applicable, as to which, during the last twenty-four (24) months of their employment with the Company: (i) Employee was assigned, or (ii) Employee had supervisory, managerial or administrative responsibilities.

Ex.  B, E, and F, § 1.1(g).

### 2.      The 2020 Agreements' Non-Solicitation Provisions

101.      In the 2020 Agreements, Arriaga, Westhorpe and Williams agreed, during their employment with the Company and for a period of twelve (12) months following the termination of their employment, they will not, directly or indirectly:

> (i) solicit, seek to employ, or seek to retain the services of any person whose identity Employee learned while employed by the Company, who is at that time or was within the previous twelve (12) months providing services to the Company as an employee or independent contractor, for the purpose of providing services to a Competing Business; or (ii) solicit or seek to place any temporary employee, candidate for employment, or independent contractor candidate, who, in the twelve (12) months prior to Employee's separation of employment with Company, was directly or indirectly placed by Employee or sought to be placed by Employee or whose identity Employee learned in carrying out Employee's job duties, which placement is for or on behalf of any Competing Business; or (iii) persuade, induce or attempt to persuade or induce any such person referenced in this subsection 2.2(b) to leave his or her employment or temporary employment or to refrain from providing services to the Company[.]

Ex. B, E and F, § 2.2(b).

102.      Defendants Arriaga, Westhorpe and Williams agreed, during their employment with the Company and for a period of twelve (12) months following the termination of their employment, they will not, directly or indirectly:

> (i) solicit or seek to provide services to any customer or potential customer of the Company with whom Employee had Material Contact, which solicitation is for or on behalf of any Competing Business; or (ii) persuade, induce or attempt to persuade or induce any such customer or potential customer to alter or reduce its use of services from the Company.

Ex. B, E and F, § 2.2(c).

103.      The 2020 Agreements define "Material Contact" as:

> [C]ontact between Employee and any Company customer or potential customer within twenty-four (24) months prior to Employee's termination or resignation in which Employee either (i)

> communicated directly with such customer or potential customer on
> behalf of the Company; or (ii) obtained Confidential Information
> about such customer or potential customer in the ordinary course of
> business as a result of Employee's association with the Company;
> or (iii) received compensation, commissions, or earnings based on
> customer's receipt of products or services from the Company

Ex. B, E and F, § 1.1(f).

### 3.  Other Relevant Provisions In The 2020 Agreements

104.   In the 2020 Agreements, Arriaga, Westhorpe and Williams agreed, "For a period of twelve (12) months after the termination of Employee's employment, Employee will promptly inform Employer in writing of any employment, consulting engagements, contract work or other business affiliations that Employee has with any Competing Business or with a Company Customer." Ex. B, E, and F, § 2.3.

105.   Section 7.3 of the 2020 Agreements states the Agreements "will be governed by the laws of the state shown in the Company records as the Employee's current primary office location, without giving effect to the state's conflict of law rules."

106.   CyberCoders records reflect that the primary office location for Arriaga, Westhorpe and Williams was Palm Beach Gardens, Florida when they executed the 2020 Agreements.

107.   Florida law governs the Arriaga Agreement, the Westhorpe Agreement, and the Williams Agreement.

### 4.  The 2022 Agreements' Non-Compete Provision

108.   In the 2022 Agreements, Section 2.2(a) prohibits O'Grady and Schuler from competing with CyberCoders:

> Employee will not directly or through others, (i) during Employee's
> employment with the company, to the extent permitted by applicable
> law, an (ii) for a period of twelve (12) months following the
> Termination Date:

> (i) perform a Competing Position for a Competing Business within the Restricted Territory; (ii) own, maintain, operate or have any ownership interest in a Competing Business; or (iii) perform any other services for a Competing Business that are likely or probable to result in the disclosure of Confidential Information[.]

Ex. C and D, § 2.2(a).

109. The 2022 Agreements define Competing Business to mean "any person, entity, business, or subdivision of a business that provides products or services that are the same as or substantially similar to, and competitive with, the Company Business or which is actively planning to engage in the Company Business." Ex. C and D, § 1.1(b).

110. The 2022 Agreements define Restricted Territory as:

> [T]he geographic territory(ies) assigned to Employee by the Company during the Look Back Period (by state, county, or other recognized geographic boundary used by the Company) and those states and counties (and their equivalents) in the United States about which Employee learned Confidential Information during the Look Back Period. If Employee has no specifically assigned geographic territory, then Restricted Territory means those states and counties (and their equivalents) in the United States (i) about which Employee learned Confidential Information during the Look Back Period, and (ii) in which Employee's contact(s) at a customer with whom Employee had Material Contact (defined above) were located during the Look Back Period.

Ex. C and D, § 1.1(h).

### 5. The 2022 Agreements' Non-Solicitation Provisions

111. O'Grady and Shuler agreed, during their employment with the Company and for a period of twelve (12) months following the termination of their employment, they will not, directly or indirectly:

> (i) solicit, seek to employ, or seek to retain the services of any employee or contractor of the Company with whom Employee worked or learned Confidential Information about during the Look Back Period; or (ii) solicit or seek to place any temporary employee, candidate for employment, or contractor candidate, who, during the Look Back Period, Employee directly or indirectly placed or whom

> Employee worked with to be placed; or (iii) persuade, induce or attempt to persuade or induce any such person referenced in this subsection 2.2(b) to leave their employment or temporary employment or modify their working relationship with the Company[.]

Ex. C and D, § 2.2(b).

112. O'Grady and Shuler agreed, during their employment with the Company and for a period of twelve (12) months following the termination of their employment, they will not, directly or through others:

> (i) solicit or seek to provide services to any customer or potential customer of the Company with whom Employee had Material Contact, which solicitation is for or on behalf of any Competing Business; or (ii) persuade, induce or attempt to persuade or induce any such customer or potential customer to alter, reduce, or terminate its relationship with the Company (collectively, "Covered Customers").

Ex. C and D, § 2.2(c).

113. The 2022 Agreements define "Material Contact" as:

> [C]ontact between Employee and any Company customer or potential customer during the Look Back Period in which Employee either (i) communicated directly with such customer or potential customer on behalf of the Company; or (ii) obtained Confidential Information about such customer or potential customer in the ordinary course of business as a result of Employee's association with the Company; or (iii) received compensation, commissions, or earnings based on customer's receipt of products or services from the Company.

Ex. C and D, § 1.1(g).

### 6.  Other Relevant Provisions Of The 2022 Agreements

114. The 2022 Agreements require O'Grady and Shuler to advise CyberCoders of subsequent employment or business affiliations: "For a period of twelve (12) months following the termination date, Employee agrees to promptly inform Employer in writing of any

employment, or other employment or other business affiliations that Employee intends to have or has with any Competing Business or with a Covered Customer."  Ex. C and D, § 2.3.

115.    Section 7.3 states the 2022 Agreements "shall be governed by the laws of the state where the Employee is last primarily employed for the Company…without giving effect to the state's conflict of law rules." Ex. C and D, § 7.3.

116.    O'Grady and Schuler were last employed by CyberCoders in Florida.

117.    Florida law governs the O'Grady Agreement and the Schuler Agreement.

**7.      The Acevedo Agreement**

118.    The Acevedo Agreement contains a non-compete provision identical to the 2022 Agreements, including the definitions of Competing Business as well as the requirement to notify CyberCoders of subsequent employment and business affiliations. Ex. A. § 1.1(g), 2.2(a), 1.1(b), and 2.3.

119.    The Acevedo Agreement defines Restricted Territory as:

[T]he geographic territory(ies) assigned to Employee by the Company during the Look Back Period (by state, county, or other recognized geographic boundary used by the Company) and those states and counties (and their equivalents) in the United States about which Employee learned Confidential Information during the Look Back Period. If Employee has no specifically assigned geographic territory, then Restricted Territory means those states and counties (and their equivalents) in the United States about which Employee learned Confidential Information during the Look Back Period.

Ex. A, § 1.1(g)

120.    The Acevedo Agreement contains a non-solicitation provision similar to the provision contained in the 2022 Agreements. Defendant Acevedo agreed, during her employment with the Company and for a period of twelve (12) months following the termination of her employment, she will not, directly or through others:

(i) solicit, seek to employ, or seek to retain the services of any employee or contractor of the Company with whom Employee

> worked or learned Confidential Information about during the Look Back Period; or (ii) solicit or seek to place any temporary employee, candidate for employment, or contractor candidate, who, during the Look Back Period, Employee directly or indirectly placed or whom Employee worked with to be placed; or (iii) persuade, induce or attempt to persuade or induce any such person referenced in this subsection 2.2(b) to leave their employment or temporary employment or modify their working relationship with the Company[.]

Ex. A, § 2.2(b).

121.    Acevedo agreed, during her employment with the Company and for a period of twelve (12) months following the termination of her employment, she will not, directly or through others:

> (i) solicit or seek to provide services to any customer or, to the extent permitted by applicable law, potential customer of the Company with whom Employee had Material Contact (collectively, "Covered Customers"), which solicitation is for or on behalf of any Competing Business; or (ii) persuade, induce or attempt to persuade or induce any such customer or potential customer to alter, reduce, or terminate its relationship with the Company.

Ex. A, § 2.2(c).

122.    Section 7.3 of the Acevedo Agreement is identical to the 2022 Agreements. Ex. A, § 7.3.

123.    Acevedo was last employed by CyberCoders in Florida.

124.    Florida law governs the Acevedo Agreement.

**8.    Other Terms Of The Agreements**

125.    The Individual Defendants agreed to refrain from disclosing any confidential information of CyberCoders, and to protect CyberCoders' trade secrets. Ex. A-F, § 1.2.

126.    The Agreements require the return of all Company information in the Individual Defendants' possession, including electronic copies saved to a portable device or web or cloud-based storage, or emailed to a personal email account. Ex. A-F, § 1.2(c).

21

127.     The Individual Defendants further agreed "that compliance with this paragraph may require that data be removed from Employee's personal computer equipment or electronic devices" and that the Company will be permitted to access such equipment for that purpose. *Id.*

128.     The Individual Defendants acknowledged and agreed that the restrictions contained in the Agreements are "necessary to protect the proprietary and related interests of the Company, and that the limitations . . . are reasonable with respect to duration, geographical area and scope of activities, and do not impose a greater restraint than is necessary to protect the Confidential Information, goodwill, and other business interests of the Company." Ex. A-F, § 7.2.

### D.     The Agreements Are Necessary To Protect CyberCoders Legitimate Business Interests.

129.     CyberCoders is engaged in the highly competitive market of recruiting for the modern workforce to meet the needs of customers in various industries.

130.     CyberCoders has developed sophisticated processes to meet the needs of its customers and developed substantial information regarding its customer base and their needs at great expense to CyberCoders, including the information contained in Cyrus.

131.     CyberCoders' confidential, proprietary information and processes are trade secrets because they derive independent economic value by virtue of not being generally known to, and not being readily ascertainable by, other persons who can obtain economic value from its disclosure or use.

132.     CyberCoders takes reasonable measures to maintain the secrecy of and protect its trade secrets, including limiting access to them and preventing anyone from accessing such information who is not subject to non-disclosure obligations.

133.     In addition to its trade secrets, CyberCoders has other valuable confidential business information which it makes available to its employees to enable CyberCoders to

effectively operate as a recruiting firm, including, but not limited to, information about compensation, performance, and business-generating details for employees under their supervision, which constitutes valuable confidential business information.

134. CyberCoders' trade secrets and confidential business information are a legitimate business reason for CyberCoders' restrictive covenants with the Individual Defendants.

135. CyberCoders also devotes significant time and resources to the development of substantial goodwill and relationships with potential and existing customers – entities who hire CyberCoders to place job applicants.

136. The Individual Defendants had access to detailed information regarding CyberCoders' customers and their needs.

137. CyberCoders substantial relationships with their potential and existing customers are a legitimate business reason for CyberCoders' restrictive covenants with the Individual Defendants.

138. Finally, CyberCoders devotes significant time and resources to the development of goodwill with its employees, candidates, and independent contractors.

139. CyberCoders develops this goodwill through its employees like the Individual Defendants.

140. CyberCoders employee, candidate, and independent contractor goodwill is a legitimate business reason for CyberCoders' restrictive covenants with the Individual Defendants.

**E.** **The Individual Defendants Join a Competing Business, Levelociti, in Violation of Their Obligations to CyberCoders**

141. On February 17, 2025, Cooke and Benedetto resigned from their employment with CyberCoders.

142.     Cooke and/or Benedetto testified in the Cooke/Benedetto Lawsuit that they resigned in order to start a new, competing recruiting firm: Levelociti.

143.     Levelociti has a principal place of business in Fort Pierce, Florida.

144.     Cooke and/or Benedetto previously testified that they are the sole owners of Levelociti, and both reside and work in this District.

145.     Levelociti is a "Competing Business" under the definition in the Agreements.

146.     Cooke hired the Individual Defendants at CyberCoders and knew that they signed the Agreements.

147.     Cooke and/or Benedetto testified that they told Arriaga, Shuler, Westhorpe and Williams about Levelociti and presented them with offers of employment while they were all employed by CyberCoders.

148.     Cooke and/or Benedetto testified that each of the Individual Defendants received and accepted offers of employment from Levelociti prior to resigning their employment with CyberCoders.

149.     Shortly after their resignations, the Individual Defendants began working for Levelociti in violation of the Agreements.

150.     The Individual Defendants are each working for Levelociti from their homes, which is the exact same location where they worked for CyberCoders at the time of their resignation.

151.     The Individual Defendants are working for Levelociti in a jurisdiction about which they received confidential information from CyberCoders.

152.     Therefore, the Individual Defendants are each working within the "Restricted Territory" as defined by the Agreements.

153.    Upon information and belief and the testimony of Cooke and Benedetto in the Cooke/Benedetto Lawsuit, the Individual Defendants are actively soliciting CyberCoders' customers, potential customers, and candidates for Levelociti in violation of their restrictive covenants.

154.    Cooke and/or Benedetto admitted that Levelociti has solicited multiple customers of CyberCoders and entered into contingency fee agreements with multiple CyberCoders' customers.

155.    Upon information and belief and the testimony of Cooke and Benedetto in the Cooke/Benedetto Lawsuit, the Individual Defendants are active participants in Levelociti, Cooke, and Benedetto soliciting CyberCoders' customers, potential customers, and candidates.

156.    CyberCoders will continue suffering a significant disruption of business, and certainly a decrease in revenue as a result of the Individual Defendants' unlawful actions because the Individual Defendants have directly begun competing with CyberCoders in violation of their restrictive covenants.

157.    By tortiously interfering with CyberCoders' contracts with the Individual Defendants, Levelociti

158.    The Individual Defendants' actions in soliciting CyberCoders' customers, potential customers, and candidates harms the longstanding relationships and customer goodwill that CyberCoders diligently protects.

159.    CyberCoders will suffer additional irreparable harm unless Defendants are immediately enjoined from soliciting CyberCoders' current customers, potential customers, and candidates.

160.    Not only are the Individual Defendants violating their non-competes, but they have gotten an unfair "head start" with Levelociti using what they learned from CyberCoders' trade secrets and confidential information to directly solicit CyberCoders' customers, potential customers, and candidates.

161.    Levelociti is unfairly competing against CyberCoders by knowingly interfering with its contracts with the Individual Defendants and assisting the breaches of those contracts.

162.    Levelociti is also tortiously interfering with Cooke and Benedetto's agreements with CyberCoders.

163.    In total and through its tortious interference, Levelociti is employing Cooke, Benedetto, and the Individual Defendants, who were responsible for approximately $11 million in business at CyberCoders.

164.    Further, given Defendants' brazen unlawful activity to date, there is a significant and immediate threat that the Individual Defendants' will also violate their employee non-solicitation obligations, if they have not already.

165.    Therefore, CyberCoders will suffer irreparable harm unless the Individual Defendants are immediately enjoined from soliciting, seeking to do business with, or recruiting CyberCoders' customers, potential customers, candidates, and employees, and unless Levelociti is immediately enjoined from continuing to tortiously interfere with the Agreements.

**F.    <u>The Individual Defendants Have Failed to Substantively Respond to CyberCoders' Outreach</u>**

166.    On February 21, 2025, counsel for Plaintiff sent letters to the Individual Defendants requesting the return of information and property and certain assurances that the Individual Defendants have not and will not violate their Agreements. Counsel for Plaintiff requested a response from the Individual Defendants by February 25, 2025.

167.    To date, the Individual Defendants have failed to substantively respond to Plaintiff's letters.

168.    CyberCoders did not know Defendants were working for Cooke and Benedetto at Levelociti until the March 24 preliminary injunction hearing in *CyberCoders v. Cooke, et al.*, Case No. 25-cv-80320-AMC.

<u>**COUNT I: BREACH OF CONTRACT**</u>
<u>**(Against Acevedo)**</u>

169.    CyberCoders incorporates by reference the allegations of the paragraphs 1-168 as if the same were set forth at length herein.

170.    The Acevedo Agreement is an enforceable contract between Acevedo and CyberCoders.

171.    CyberCoders has satisfied all of its obligations under the terms and conditions of the Acevedo Agreement that it was required to perform, and Acevedo's performance of her obligations under this agreement was not excused.

172.    Acevedo breached the Acevedo Agreement by working for a competing business venture within 12 months of the end of her employment with CyberCoders and in the Restricted Territory.

173.    Specifically, Acevedo breached the Acevedo Agreement by working for Levelociti from the same location she worked for CyberCoders immediately upon her resignation from CyberCoders.

174.    Additionally, upon information and belief, Acevedo breached the Acevedo Agreement by soliciting CyberCoders' customers, potential customers, and candidates as part of her employment at Levelociti.

175.     As a direct and proximate result of Acevedo's breaches and threatened breaches, CyberCoders has suffered damage, in an amount to be proven at trial.

176.     CyberCoders will continue to be directly and proximately damaged and irreparably harmed if Acevedo is not enjoined from further violation of her contractual obligations to CyberCoders.

177.     CyberCoders does not have an adequate remedy at law and will not be fully compensated for Acevedo's breaches without injunctive relief.

<u>COUNT II: BREACH OF CONTRACT</u>
<u>(Against Arriaga)</u>

178.     CyberCoders incorporates by reference the allegations of the paragraphs 1-168 as if the same were set forth at length herein.

179.     The Arriaga Agreement is an enforceable contract between Arriaga and CyberCoders.

180.     CyberCoders has satisfied all of its obligations under the terms and conditions of the Arriaga Agreement that it was required to perform, and Arriaga's performance of her obligations under these agreements was not excused.

181.     Arriaga breached the Arriaga Agreement by working for a competing business venture within 12 months of the end of her employment with CyberCoders and in the Restricted Territory.

182.     Specifically, Arriaga breached the Arriaga Agreement by working for Levelociti from the same location she worked for CyberCoders, immediately upon her resignation from CyberCoders.

183.     Additionally, upon information and belief, Arriaga breached the Arriaga Agreement by soliciting CyberCoders' customers, potential customers, and candidates as part of her employment at Levelociti.

184.     As a direct and proximate result of Arriaga's breaches, CyberCoders has suffered damage, in an amount to be proven at trial.

185.     CyberCoders will continue to be directly and proximately damaged and irreparably harmed if Arriaga is not enjoined from further violation of her contractual obligations to CyberCoders.

186.     CyberCoders does not have an adequate remedy at law and will not be fully compensated for Arriaga's breaches without injunctive relief.

**COUNT III: BREACH OF CONTRACT**
**(Against O'Grady)**

187.     CyberCoders incorporates by reference the allegations of the paragraphs 1-168 as if the same were set forth at length herein.

188.     The O'Grady Agreement is an enforceable contract between O'Grady and CyberCoders.

189.     O'Grady breached the O'Grady Agreement by working for a competing business venture within 12 months of the end of his employment with CyberCoders and in the Restricted Territory.

190.     Specifically, O'Grady breached the O'Grady Agreement by working for Levelociti from the same location he worked for CyberCoders, immediately upon his resignation from CyberCoders.

191.    Additionally, upon information and belief, O'Grady breached the O'Grady Agreement by soliciting CyberCoders' customers, potential customers, and candidates as part of his employment at Levelociti.

192.    As a direct and proximate result of O'Grady's breaches and threatened breaches, CyberCoders has suffered damage, in an amount to be proven at trial.

193.    CyberCoders will continue to be directly and proximately damaged and irreparably harmed if O'Grady is not enjoined from further violation of his contractual obligations to CyberCoders.

194.    CyberCoders does not have an adequate remedy at law and will not be fully compensated for O'Grady's breaches without injunctive relief.

## COUNT IV: BREACH OF CONTRACT
### (Against Shuler)

195.    CyberCoders incorporates by reference the allegations of the paragraphs 1-168 as if the same were set forth at length herein.

196.    The Shuler Agreement is an enforceable contract between Shuler and CyberCoders.

197.    CyberCoders has satisfied all of its obligations under the terms and conditions of the Shuler Agreement that it was required to perform, and Shuler's performance of his obligations under these agreements was not excused.

198.    Shuler breached the Shuler Agreement by working for a competing business venture within 12 months of the end of his employment with CyberCoders and in the Restricted Territory.

199.    Specifically, Shuler breached the Shuler Agreement by working for Levelociti from the same location he worked for CyberCoders, immediately upon his resignation from CyberCoders.

200.    Additionally, upon information and belief, Shuler breached the Shuler Agreement by soliciting CyberCoders' customers, potential customers, and candidates as part of his employment at Levelociti.

201.    As a direct and proximate result of Shuler's breaches and threatened breaches, CyberCoders has suffered damage, in an amount to be proven at trial.

202.    CyberCoders will continue to be directly and proximately damaged and irreparably harmed if Shuler is not enjoined from further violation of his contractual obligations to CyberCoders.

203.    CyberCoders does not have an adequate remedy at law and will not be fully compensated for Shuler's breaches without injunctive relief.

## COUNT V: BREACH OF CONTRACT
### (Against Westhorpe)

204.    CyberCoders incorporates by reference the allegations of the paragraphs 1-168 as if the same were set forth at length herein.

205.    The Westhorpe Agreement is an enforceable contract between Westhorpe and CyberCoders.

206.    CyberCoders has satisfied all of its obligations under the terms and conditions of the Westhorpe Agreement that it was required to perform, and Westhorpe's performance of his obligations under these agreements was not excused.

207.    Westhorpe breached the Westhorpe Agreement by working for a competing business venture within 12 months of the end of his employment with CyberCoders and in the Restricted Territory.

208.     Specifically, Westhorpe breached the Westhorpe Agreement by working for Levelociti from the same location he worked for CyberCoders, immediately upon his resignation from CyberCoders.

209.     Additionally, upon information and belief, Westhorpe breached the Westhorpe Agreement by soliciting CyberCoders' customers, potential customers, and candidates as part of his employment at Levelociti.

210.     As a direct and proximate result of Westhorpe's breaches and threatened breaches, CyberCoders has suffered damage, in an amount to be proven at trial.

211.     CyberCoders will continue to be directly and proximately damaged and irreparably harmed if Westhorpe is not enjoined from further violation of his contractual obligations to CyberCoders.

212.     CyberCoders does not have an adequate remedy at law and will not be fully compensated for Westhorpe's breaches without injunctive relief.

<u>**COUNT VI: BREACH OF CONTRACT**</u>
<u>**(Against Williams)**</u>

213.     CyberCoders incorporates by reference the allegations of the paragraphs 1-168 as if the same were set forth at length herein.

214.     The Williams Agreement is an enforceable contract between Williams and CyberCoders.

215.     CyberCoders has satisfied all of its obligations under the terms and conditions of the Williams Agreement that it was required to perform, and Williams' performance of his obligations under these agreements was not excused.

216.    Williams breached the Williams Agreement by working for a competing business venture within 12 months of the end of his employment with CyberCoders and in the Restricted Territory.

217.    Specifically, Williams breached the Williams Agreement by working for Levelociti from the same location he worked for CyberCoders, immediately upon his resignation from CyberCoders.

218.    Additionally, upon information and belief, Williams breached the Williams Agreement by soliciting CyberCoders' customers, potential customers, and candidates as part of his employment at Levelociti.

219.    As a direct and proximate result of Williams' breaches and threatened breaches, CyberCoders has suffered damage, in an amount to be proven at trial.

220.    CyberCoders will continue to be directly and proximately damaged and irreparably harmed if Williams is not enjoined from further violation of his contractual obligations to CyberCoders.

221.    CyberCoders does not have an adequate remedy at law and will not be fully compensated for Williams' breaches without injunctive relief.

## COUNT VI: TORTIOUS INTERFERENCE WITH CONTRACT
### (Against Levelociti)

222.    CyberCoders incorporates by reference the allegations of the paragraphs 1-168 as if the same were set forth at length herein.

223.    Levelociti tortiously interfered with the Agreements.

224.    CyberCoders has legal rights under the Agreements. During the Individual Defendants' employment with Levelociti, the Individual Defendants have violated the

Agreements, including by competing with CyberCoders and actively soliciting and seeking to do business with CyberCoders' customers, potential customers, and candidates.

225.    Cooke hired and supervised all the Individual Defendants at CyberCoders and is therefore aware of the Agreements.

226.    Benedetto was similarly aware of the Agreements.

227.    Since Cooke and Benedetto own Levelociti, Levelociti has knowledge of the Agreements.

228.    Levelociti tortiously interfered with CyberCoders' rights under the Agreements, including by incentivizing and assisting the Individual Defendants to breach the Agreements for Levelociti's benefit.

229.    Despite having knowledge of CyberCoders' legal rights under the Agreements, Levelociti intentionally and unjustifiably interfered with CyberCoders' contractual relationship by inducing and facilitating the Individual Defendants' breaches of the Agreements.

230.    Levelociti's actions was the cause of the Individual Defendants' breaches of the Agreements.

231.    Levelociti has and will directly benefit from the Individual Defendants' violations of the Agreements.

232.    Levelociti was and is aware of the Individual Defendants' breaches, and ratified and condoned the same.

233.    As a direct and proximate result of Levelociti's intentional and unjustified interference with CyberCoders' contractual relationship with the Individual Defendants, CyberCoders has and will continue to suffer damages, including but not limited to, loss of business

and profits, damage to relationships with existing and potential customers and damage to its business goodwill.

234.    CyberCoders will continue to be directly and proximately damaged and irreparably harmed if Levelociti is not enjoined from further interfering with the Individual Defendants' contractual obligations to CyberCoders.

235.    CyberCoders does not have an adequate remedy at law and will not be fully compensated for Levelociti's breaches without injunctive relief.

<u>**PRAYER FOR RELIEF**</u>

WHEREFORE, CyberCoders respectfully requests this Court enter an Order with the following relief:

a.    Preliminarily and permanently enjoining and restraining Defendants, and anyone acting in concert with them, from directly or indirectly violating the non-competition provisions in the Agreements.

b.    Preliminarily and permanently enjoining and restraining the Individual Defendants, and anyone acting in concert with them, from directly or indirectly violating the non-solicitation provisions in the Agreements.

c.    Preliminarily and permanently enjoining and restraining the Individual Defendants, and anyone acting in concert with them, from directly or indirectly violating the Agreements.

d.    Tolling the Individual Defendants' restrictive covenants based on their violations of their Agreements.

e.    Preliminarily and permanently enjoining and restraining Levelociti, and anyone acting in concert with it, from aiding, assisting, or interfering with the Agreements.

f.    Requiring Defendants to preserve all documents, electronically stored information and other information potentially relevant to the factual allegations and claims contained within this Verified Complaint, including any communications, text messages, WhatsApp messages, or emails on personal electronic devices, such as cellular telephones, or stored in email or other cloud storage accounts, by and between Defendants; between Defendants and any CyberCoders employee; between Defendants and any CyberCoders customer or potential customer; and between Defendants and any CyberCoders candidate.

g.      Requiring Defendants to return all copies of all CyberCoders documents in their possession, custody, and control, and a forensic examination of Defendants' devices (including personal laptops, cell phones, and tablets) and accounts (including cloud storage accounts, such as Google Drive). In order to do so, the Order should require Defendants to, at Defendants' expense: (i) stipulate to and agree with counsel for Plaintiff on a non-party forensic vendor; (ii) jointly submit to the Court a forensic protocol to accomplish the return and remediation of CyberCoders' documents from the Defendants' possession (i.e., to permanently remove the documents from the Defendants' possession), and disclosure of communications concerning Defendants' solicitation of CyberCoders employees and of CyberCoders' customers, with Defendants bearing all costs of the return and remediation; and (iii) require sworn declarations from Defendants and the non-party forensic vendor attesting to the return and remediation of all CyberCoders-related documents and communications on Defendants' devices.

h.      Awarding CyberCoders damages for Defendants' wrongful conduct, according to proof at trial.

i.      Awarding disgorgement of any profits, commissions or monies earned by Defendants as a result of their unlawful conduct.

j.      Awarding compensatory, consequential and punitive damages.

k.      Awarding CyberCoders its reasonable attorneys' fees, costs, and expenses, as well as pre-and post-judgment interest.

l.      Granting such other and further relief as the Court may deem just, equitable, and proper.

Dated: May 8, 2025                    LITTLER MENDELSON P.C.


                                      /s/ Tyler A. Sims
                                      Tyler A. Sims, Esq.
                                      Florida Bar No. 1048908
                                      tsims@littler.com
                                      West A. Holden, Esq.
                                      Florida Bar No. 0113569
                                      wholden@littler.com
                                      111 North Orange Avenue, Suite 1750
                                      Orlando, FL 32801.2366
                                      Tel:    407.393.2900
                                      Fax:    407.393.2929
                                      *Attorneys for Plaintiff*

## <u>VERIFICATION</u>

I, JENNIFER BRINK, verify that I am the Vice President of Human Resources of CyberCoders, Inc., Plaintiff in this proceeding, and that the facts set forth in the foregoing Verified Complaint are true and correct to the best of my knowledge, information, and belief, except (1) where expressly stated to be based upon information and belief, in which case, I believe them to be true, and (2) legal conclusions, for which I expressly defer to Plaintiff's counsel.

I understand that false statements herein are subject to the penalties of 28 U.S.C. § 1746 relating to sworn declarations to authorities.

Dated: May __8__, 2025

JENNIFER BRINK